IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 24, 2011

## NELSON TROGLIN v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Bledsoe County**
**No. 57-2002     Thomas W. Graham, Judge**

_____

**No. E2010-01041-CCA-MR3-PC - Filed July 22, 2011**

_____

The Petitioner, Nelson Troglin, appeals as of right from the Bledsoe County Circuit Court's denial of his petition for post-conviction relief. The Petitioner was convicted of second degree murder and sentenced as a Range I, standard offender to 23 years in the Tennessee Department of Correction. In this appeal as of right, the Petitioner contends (1) that the trial court erred in failing to admonish the jury, instructing the jury to reach a verdict before the July 4th holiday, and in failing to sentence him in open court; (2) that the post-conviction court erred in denying his motion to recuse and his motion for funds to obtain a ballistics expert; and (3) that trial counsel was ineffective. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JERRY L. SMITH and ROBERT W. WEDEMEYER, JJ., joined.

Joseph E. Ford, Winchester, Tennessee, for the appellant, Nelson Troglin.

Robert E. Cooper, Jr., Attorney General and Reporter; Matthew Bryant Haskell, Assistant Attorney General; James Michael Taylor, District Attorney General; and James William Pope, III, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

On direct appeal, this court affirmed the Petitioner's second degree murder conviction. State v. Nelson Troglin, No. E2001-00251-CCA-R3-CD, 2002 WL 385800 (Tenn. Crim. App. Mar. 12, 2002). Although the facts of the Petitioner's case have already been discussed

in this court's opinion affirming his conviction, we will provide the following factual summary to establish the context for the issues before this court.

This case arose from the shooting death of the victim. On June 15, 1998, Richard Stafford found the victim's lifeless body in the victim's bedroom sometime after 6:30 p.m. The victim had been shot four times with a 9mm rifle. The murder weapon was never found. One of the bullets remained in the victim's body, while the other three bullets exited the body and were found in various places in the victim's bedroom. Four expended 9mm Winchester Luger hulls were found in the victim's bedroom. Officers found more than $400 in the victim's left front pocket. The victim's right front pocket was empty and "had been pulled out exposing the pocket area." In the investigation of the victim's death, the Petitioner was developed as a potential suspect.

On Saturday, June 13, the Petitioner was at Mr. Holland's game room with the victim, Richard Wooden, and Dennis Johnson. The Petitioner asked Mr. Wooden to step into the hallway, where the Petitioner asked Mr. Wooden for a gun and told him that he wanted to steal the victim's money. Mr. Wooden told the Petitioner that he should just ask the victim for the money because the victim would likely give him the money. After that conversation, the Petitioner called Mr. Wooden into the hallway two more times and asked him if he could use his gun. Mr. Wooden refused. The Petitioner suggested that Mr. Wooden could just offer to take the victim home in order to allow the Petitioner to stop the car and steal the victim's money. In furtherance of this plan, the Petitioner offered Mr. Wooden half of the victim's money. Mr. Wooden again refused. The Petitioner told Mr. Wooden that he was going to kill the victim and take his money.

The Petitioner purchased a 9mm semiautomatic Marlin from Norman Blaylock on Sunday, June 14. Mr. Blaylock gave the Petitioner ammunition, and the Petitioner test-fired the weapon, leaving six expended hulls on the Blaylock property. The Petitioner attempted to sell the 9mm weapon to Bob and Helen Smith later that day. While on their property, he shot the weapon into the air, leaving two expended hulls on the Smith property. Agent Steve Scott of the Tennessee Bureau of Investigation (TBI) examined the four hulls found at the victim's residence, the six hulls found at the Blaylock residence, and the two hulls found at the Smith residence. He determined that all 12 of the hulls had been fired from the same 9mm weapon.

At trial, Roger Hodge testified that the Petitioner came into his store, Nyla's Place, on Monday, June 15 and purchased a box of 9mm Winchester ammunition for $20. Nyla Hodge confirmed that the Petitioner came to their store that day and said that the Petitioner was there for approximately 15 minutes between 5:00 and 5:30 p.m. Bob Swafford said that

he was at Nyla's Place on June 15 at approximately 5:00 p.m. when the Petitioner was talking to Roger Hodge about ammunition.

Billy Frank Wheeler testified that he last saw the victim at the post office at approximately 4:30 p.m. on Monday, June 15. Nannie Lou Troglin, the victim's half-sister, testified that on that day, the victim had visited her and showed her that he had a large sum of money. Ms. Troglin stated that she saw the Petitioner's car at the victim's house later that afternoon. Mike Stafford and Virginia Wright, who lived down the street from the victim, testified that they saw the Petitioner's car at the victim's house after 5:00 p.m. Ron Sullivan and Christy Luttrell testified that they, along with Richard Stafford, were at the Stafford residence on that day and that as they were leaving to take a car to get the tire fixed, they saw the Petitioner's car at the victim's house after 5:00 p.m. They also testified that they saw the Petitioner's car at the victim's residence on their return trip to the Stafford home.

Richard Stafford said that he went with Ron Sullivan and Christy Luttrell to get Ron Sullivan's tire fixed. He said that he saw the Petitioner's car at the victim's residence on their way out and on the return trip. He said that once they returned, he walked to the victim's residence with Senora Joyner sometime after 6:30 p.m. He said that the Petitioner's car was no longer there and that he and Senora Joyner were at the residence for a little while before he discovered the victim's body in the bedroom.

Ted Fugate testified that he bought a truck from the victim for $1,500 on Saturday, June 13. He said that the week before the victim died, the Petitioner lost approximately $1,500 in a game at Mr. Holland's game room. He said that on Monday, June 15, he was at Mr. Holland's game room when the Petitioner arrived. After everyone had just heard about the victim's death, the Petitioner laid some money on the table and said he wanted to contribute the money for flowers. Richard Wooden testified that when the Petitioner laid the money down, the Petitioner said, "There's the s - n of a b - - - h some flowers."

The Petitioner was charged with first degree murder. Following the presentation of the evidence, the jury convicted the Petitioner of the lesser-included offense of second degree murder. After the Petitioner's convictions were affirmed on appeal, the Petitioner filed a timely petition for post-conviction relief on September 16, 2002.

The post-conviction evidentiary hearing was held on two separate days over the course of eight months. The Petitioner testified that he gave trial counsel a list of the witnesses that he wanted to testify but that trial counsel "left out part of them." He stated that he wanted trial counsel to ask Lord Meyers to testify on his behalf and that Mr. Meyers would have testified that the Petitioner "wouldn't even kill a dog," meaning that he was not a violent person. He stated that he wanted counsel to ask Senora Joyner to testify on his behalf and

that Ms. Joyner would have testified that the Petitioner was not present at the victim's house when the victim's body was found. He stated that he wanted counsel to ask Bobby Holland to testify on his behalf and that Mr. Holland would have testified that the Petitioner did not shoot a 9mm rifle at the Smith residence on Sunday, June 14. He stated that he wanted counsel to ask Henry Sapp to testify on his behalf. The Petitioner said that Mr. Sapp would have testified that Wilburn Smith told him that Bob Swafford would testify that the Petitioner did not kill the victim. He stated that trial counsel did not subpoena Mr. Meyers, Ms. Joyner, Mr. Holland, or Mr. Sapp.

The Petitioner stated that trial counsel failed to file motions to exclude the expert testimony regarding the 9mm hulls found at the victim's residence and at the Blaylock and Smith residences. He stated that trial counsel failed to hire a ballistics expert to rebut the State's experts at trial. He stated that he told trial counsel he could pay for an expert but that trial counsel never retained an expert.

The Petitioner testified that the trial court did not sentence him in open court and that he did not learn that he had received a sentence of 23 years until he was in the county jail. He said that on the first day of trial, the trial court failed to admonish the jury to refrain from obtaining and considering outside information and that trial counsel did not request such an admonition until the second day of trial. He said that the trial court directed Mel Matthews to inform the jury that they would be sequestered until Monday, July 3 if they did not come to a decision by the end of the day. The Petitioner stated that informing the jurors that they would be held over the weekend was prejudicial because the jurors knew that if they did not come to a decision, then their potential July 4th holiday plans would be interrupted. He stated that he did not talk to counsel about the trial court's instruction. He stated that at least one juror was allowed to leave because she had plans for the July 4th holiday.

On cross-examination, the Petitioner said that trial counsel did not tell him that if Lord Meyers testified on his behalf as a character witness, then the State could question him regarding the alleged shooting of Mike Stafford, a witness at trial. He said that while he was awaiting trial for the victim's death, he was charged with shooting Mike Stafford. He admitted that Bob Swafford testified at trial but did not testify that the Petitioner did not kill the victim. He stated that trial counsel did not ask Mr. Swafford whether the Petitioner killed the victim. He admitted that he did not have any proof that the jurors received outside information because the trial court failed to admonish them until the second day of trial.

Mel Matthews, a bailiff at the courthouse, testified that he was present during the Petitioner's trial and that he was in charge of the jury. He stated that at the end of the day on Saturday, July 1, the trial court told him to ask the jurors whether they "wanted to continue to deliberate or go to supper." He stated that the jurors told him that they wanted

to continue deliberating and that the jurors reached a decision shortly after he spoke with them. He stated that he did not tell the jury what would happen if they failed to reach a verdict before the end of the day. He identified a document that was written by trial counsel and signed by him. He stated that per his instructions, trial counsel crossed out the portions that he did not agree with.

Henry Sapp testified that he knew that the Petitioner had been charged with first degree murder. He stated that he did not have any conversations with Bob Swafford or anyone else about the Petitioner's case. Senora Joyner testified that she cleaned the victim's house and that she went with Richard Stafford every day to see the victim. She said that she was at the house with Richard Stafford when the victim's body was found. She stated that she did not see the Petitioner or his car when the body was found but that she was not at the house when the victim was killed. She stated that trial counsel did not ask her to testify or be present at the trial in case he needed her, but she admitted that she had a drinking problem that affected her memory and that it was possible that she just did not remember coming to the trial at counsel's request.

Trial counsel testified that he had been practicing law for 27 years, that he had been a general sessions judge for 17 years, and that the "majority" of his private practice involved criminal law. He stated that he had represented defendants who had been charged with homicide before and that he had probably "tried 10 to 20 murder cases" before he represented the Petitioner. He stated that he had been contacting witnesses on the Petitioner's behalf before the Petitioner had even been indicted and that he obtained affidavits from alibi witnesses prior to trial.

Trial counsel said that he believed that he had a good working relationship with the Petitioner and that prior to receiving the verdict, the Petitioner was "commending" him for the work that he had done on the case. He said that he met with the Petitioner approximately 16 times. He said that the Petitioner never complained that he was not meeting with him enough. He said that he did not believe that having additional meetings would have been beneficial.

Trial counsel said that he interviewed Lord Meyers at the Petitioner's request. He said that he decided that Mr. Meyers's testimony relative to the Petitioner's truthfulness would not have been admissible because the Petitioner was not going to testify. He stated that if he had called Mr. Meyers, the State would have been able to cross-examine him regarding the alleged shooting of Mike Stafford. He said that he could not remember whether he interviewed Senora Joyner but stated that he would not have wanted her as a witness for the Petitioner. He said that Ms. Joyner was not "well thought of in the community." He admitted that he had been made aware of a statement by Bob Swafford but that the statement

would not have been admissible through Henry Sapp or any other witness. He stated that he did not interview Bobby Holland because the Petitioner had never given him Mr. Holland's name. He stated that he investigated and followed up on all of the Petitioner's requests and that he could not think of anything that he should have done that he did not do in preparation for the Petitioner's case.

Trial counsel stated that he filed motions to prevent additional testing of the bullet recovered from the victim's body and exclude several State witnesses who would testify about that bullet. He said that the Petitioner never told him to hire a ballistics expert. He said that they did not need a ballistics expert because they were alleging that the Petitioner did not shoot the victim. He said that challenging the bullet hulls found at the various residences would not have added to their theory of the case. He admitted that he raised the issue of a ballistics expert in a motion to continue that he filed right before the trial was scheduled to start. He explained that the State notified him right before trial that they had tested the bullet found in the victim. He said that the motion to continue was filed "more in an effort to try to obtain a continuance than anything, to try to prepare, if necessary, for that one little bullet that we didn't have any notice of."

Trial counsel said that he could not recall whether the trial court admonished the jurors prior to trial but that he would "be surprised" if the trial court had neglected to so instruct the jury because the court was "notorious for giving a mini charge to jurors" before trial. He said that he did not have any reason to believe that the jurors had obtained outside information.

Relative to the Petitioner's sentencing hearing, trial counsel testified that the trial court entered the judgment after the hearing. The trial court instructed the parties that he could not make a sentencing decision until after he determined whether he could consider the alleged shooting of the potential witness as an enhancement factor. The court advised the parties that the sentence would be 20 years if he could not consider the shooting but that the sentence would be 23 years if he could consider the shooting.

On cross-examination, trial counsel testified that he urged the Petitioner to let him pursue a claim of self-defense, instead of the alibi defense that they pursued at trial. He admitted that if Bobby Holland had been present with the Petitioner at the Smith residence, then Mr. Holland would have been an important witness at trial. He stated that the Petitioner never said anything about Mr. Holland. He said that he knew who Mr. Holland was and that he met with several of Mr. Holland's relatives. He said that in his investigation of the case, nobody ever mentioned Mr. Holland's name.

Relative to the trial court's alleged instruction regarding the July 4th holiday, trial counsel testified that the trial court had concerns about the jury deliberating on Sunday. He said that everyone was seated in the back clerk's office when the jury sent out a question about dinner that night. Prompted by the question, they discussed what would happen if the jury were to not reach a verdict that night. The trial court determined that the jury would be sequestered Sunday and resume deliberations on Monday, July 3. He admitted that he may have asked the trial court to refrain from instructing the jury regarding what would happen if they did not reach a verdict that night. He said that until after the trial was over, he was not aware that Mel Matthews had allegedly instructed the jury that they would be deliberating over the holiday. He said that after the trial, he obtained an affidavit from Mr. Matthews regarding the conversation and included the issue in his motion for new trial. He said that after securing the affidavit, he did not believe that he should pursue the claim on appeal because he could not establish that the jury was pressured to reach a decision. He said that after the trial, he spoke with one of the jurors, who could not substantiate the claim.

Bobby Holland testified that the Petitioner was his wife's uncle and that he had known the Petitioner for 20 or 25 years. He stated that he was aware that the Petitioner was charged with the shooting death of the victim. He said that prior to the victim's death, he and the Petitioner went to Helen and Bob Smith's house. He said that he and the Petitioner had only been to the Smith house on one occasion and that on that occasion, the Petitioner did not fire any weapons on the Smith property. He admitted that he had consumed a few beers on that day but stated that he did not believe that he was intoxicated. He stated that the Petitioner's trial counsel never contacted him but that had he been contacted, he would have been willing to testify on the Petitioner's behalf.

On cross-examination, Bobby Holland admitted that he had no way of knowing whether the Petitioner had gone alone to the Smith residence on another date. He stated that the Petitioner had never asked him to testify and that they never discussed their visit to the Smith residence. On re-direct examination, he stated that he did not know that the Smiths had testified at trial that the Petitioner came to their house and shot a weapon on their property.

Following the evidentiary hearing, the post-conviction court found that the Petitioner had "failed to prove by clear and convincing evidence that [trial counsel's] representation fell below an objective standard of reasonableness[] and that [trial counsel's] performance prejudiced the defense, resulting in a failure to produce a reliable result." The post-conviction court also found that the Petitioner had "failed to prove by clear and convincing evidence that the [c]ourt gave an instruction to the jury that it would be sequestered over the July 4th holiday unless it came to a decision prior thereto." The post-conviction court stated that the Petitioner's sentencing hearing was conducted in open court.

## ANALYSIS

### I. Trial court errors

The Petitioner contends that the trial court erred by failing to admonish the jury on the first day of trial, by instructing the jury that they would be sequestered over the July 4th holiday if they did not reach a decision, and by failing to sentence the Petitioner in open court. The Petitioner asserts that he is entitled to a new trial because of these errors. The State responds that these issues are waived because the Petitioner failed to raise the issues on direct appeal.

The Petitioner did not raise these issues on direct appeal. "There is a rebuttable presumption that a ground for relief not raised before a court of competent jurisdiction in which the ground could have been presented is waived." Tenn. Code Ann. § 40-30-110(f). In determining whether an issue is waived in a post-conviction proceeding, the Tennessee Code provides,

> (g) A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented unless:
>
>> (1) The claim for relief is based upon a constitutional right not recognized as existing at the time of trial if either the federal or state constitution requires retroactive application of that right; or
>>
>> (2) The failure to present the ground was the result of state action in violation of the federal or state constitution.

Tenn. Code Ann § 40-30-106(g). Following our review, we conclude that the special circumstances provided in Tenn. Code Ann. § 40-30-106(g)(1)-(2) do not apply in this case; therefore, the issues are waived.

### II. Motion to recuse

The Petitioner contends that the post-conviction court erred in denying his motion to recuse itself because the court was a material witness with respect to two of his issues in his

-8-

petition. The Petitioner asserts that the court had knowledge regarding whether it had failed to admonish the jury on the first day of trial and whether it had directed the jury to come to a decision before the July 4th holiday. The State responds that the post-conviction court did not abuse its discretion when "its impartiality could not be questioned and where no injustice has been shown."

The post-conviction court held a hearing on the motion to recuse relating to the alleged July 4th instruction. Prior to receiving testimony from trial counsel, the court said that it would recuse itself "once a legitimate issue was raised" but that it would not "recuse based on allegations that ha[d] no factual basis." The judge further stated,

> If there's some dispute where you've got somebody under oath saying that I
> did something that was improper, then at that point, yeah, I should recuse.

The judge stated that all he could say under cross-examination was that he did not recall anything like that and that he did not think he would have said that.

Trial counsel testified at the hearing that the jury started deliberating in the early part of the afternoon on Saturday, July 1. At some point, Mel Matthews came to the clerk's office and asked what would happen if the jury were unable to reach a verdict that night. Trial counsel stated that Mr. Matthews phrased the question in a way that suggested that the jury had asked him to ask the trial court. The trial court told Mr. Matthews that if the jury did not reach a verdict, "they would be sequestered through Sunday, the next day, and they would resume their deliberations on Monday, July the 3rd." Trial counsel could not remember if the trial court told Mr. Matthews to relay the information to the jury. Trial counsel said that he thought Mr. Matthews was instructed to inform the jury and that he did not remember whether he raised an objection. Trial counsel admitted that he raised the issue in his motion for new trial but did not assert the issue on appeal. Trial counsel explained that he did not include the issue on appeal because he could not prove that Mr. Matthews relayed the information to the jury. Trial counsel attempted to obtain an affidavit from Mr. Matthews that would have substantiated his claim, but Mr. Matthews refused to sign the affidavit as written. Trial counsel did not interview any of the jurors regarding this issue.

Following the hearing and the arguments of defense counsel and the State, the post-conviction court found that it had not been given any basis to recuse itself. The court told the Petitioner that he could "contact the jurors and see if they have anything that would shed any light on [the July 4th issue]" but that he was denying the motion for the time being because it did not have any strong recollection of the issue.

While the Petitioner did not allege at the hearing that the court was a material witness or had knowledge regarding the admonishment issue, the Petitioner asserts that throughout the post-conviction evidentiary hearing, the court interjected itself and commented on both of the issues. Relative to whether the jury had been admonished, the post-conviction court reviewed the trial transcript and stated,

> I always explain to the jury the jurors' obligations at the beginning. I guess anything is possible, but - - we've got motions here at the beginning.

> See, here's the problem, they did not transcribe - - the transcript just says: "The officers were sworn to take charge of the jury, a sequestered jury being requested; the [c]ourt made comments to the jury; the jury was sworn." These comments are where I always discuss those matters, so I am absolutely sure that there was a discussion of the four things that they're not to do at that point, but if anybody, you know, really really wants to see it, we can have the court reporter go back and hopefully we've still got the tapes and we can get that portion.

This comment occurred while the court was considering the merits of the claim and before the court received testimony related to the issue of the ineffective assistance claim. Relative to the court's alleged instruction regarding the July 4th holiday, the post-conviction court stated,

> I would never send any message back to a jury if you don't come up with a decision pretty quick you're going to be here - - I wouldn't have done that under any circumstance.

This comment occurred while trial counsel was testifying relative to the ineffective assistance of counsel claim.

The trial judge's decision to recuse is a matter of his or her discretion. Caruthers v. State, 814 S.W.2d 64, 67 (Tenn. Crim. App. 1991). On appeal, this court will not reverse the decision of the trial judge unless the evidence in the record indicates an abuse of that discretion. Pannell v. State, 71 S.W.3d 720, 725 (Tenn. Crim. App. 2001); State v. Cash, 867 S.W.2d 741, 749 (Tenn. Crim. App. 1993). A judge should recuse himself or herself whenever the judge's "impartiality [could] reasonably be questioned." Alley v. State, 882 S.W.2d 810, 820 (Tenn. Crim. App. 1994) (quoting Code of Judicial Conduct, Canon 3(c) (now part of Tenn. Sup. Ct. R. 10, Canon 3(E)(1)). As relevant to this case, a judge should recuse himself or herself when "the judge has . . . personal knowledge of disputed evidentiary facts concerning the proceeding." Tenn. Sup. Ct. R. 10, Canon 3(E)(1)(a). Furthermore,

recusal is appropriate "whenever the judge has any doubts about his or her ability to preside impartially" or "when a person of ordinary prudence in the judge's position . . . would find a reasonable basis for questioning the judge's impartiality." Id. (footnote omitted).

Here, the post-conviction court found that it did not have personal knowledge of disputed evidentiary facts and that it would reconsider the motion if the Petitioner brought forth a witness who testified that the court had told the jury that they would be sequestered over the holiday if they did not reach a decision. The Petitioner did not submit any witnesses who substantiated either claim. Indeed, the Petitioner was the only witness who testified that the court instructed Mel Matthews to inform the jurors that they would be sequestered over the holiday if they did not reach a decision. Mr. Matthews denied that he ever told the jury what would happen if they failed to reach a decision. Trial counsel testified that he could not substantiate the Petitioner's claim regarding the alleged holiday instruction. The Petitioner was also the only witness who testified that the trial court did not admonish the jury. Trial counsel stated that he would be surprised if the trial court had not admonished the jury.

Following our review, we do not believe that the post-conviction court was a necessary or material witness or that the court had any personal knowledge of disputed evidentiary facts. The post-conviction court did not have any personal knowledge other than to say that he did not believe that he would given the holiday instruction or that he would have forgotten to admonish the jury. Moreover, there was not a reasonable basis to question the court's impartiality. The court offered to give the Petitioner more time to secure witnesses and to transcribe the instructions from the trial in order to establish his claim of ineffective assistance of counsel on both issues. While the court should have refrained from making comments during trial counsel's testimony relative to these issues, the court was not biased against the Petitioner. Accordingly, we conclude that the post-conviction court did not abuse its discretion in denying the Petitioner's motion to recuse.

### III. Denial of funds to retain ballistics expert

The Petitioner contends that the post-conviction court erred in denying his request to obtain a ballistics expert and that he is entitled to a new post-conviction hearing at which he can submit expert testimony. The Petitioner asserts that had he been given the funds to hire the expert, he would have been able to rebut the State's theory that the 12 hulls found at the various residences were fired from the same 9mm weapon, thereby proving that counsel was ineffective for failing to retain an expert. The State responds that the Petitioner's argument is contrary to the law because the Tennessee Supreme Court Rules specifically prohibit the authorization of expert services in non-capital post-conviction proceedings.

The post-conviction court did not have the authority to approve funds for the Petitioner to obtain a ballistics expert. Indeed, "[i]n non-capital post-conviction proceedings, funding for investigative, expert, or other similar services shall not be authorized or approved." Tenn. Sup. Ct. R. 13 § 5(a)(2) (citing State v. Davis, 912 S.W.2d 689, 696-97 (Tenn. 1995)). In Davis, the supreme court held that the State "is not required to provide expert assistance to indigent non-capital post-conviction petitioners." 912 S.W.2d at 696-97. Accordingly, we conclude that the post-conviction court did not err in denying the Petitioner's motion for funds to obtain a ballistics expert.

## IV. Ineffective assistance of counsel

The Petitioner contends that trial counsel was ineffective for failing to retain a ballistics expert; failing to call several witnesses, specifically Bobby Holland; failing to object to the trial court's failure to admonish the jury; and failing to object to the trial court's instruction to the jury regarding the July 4th holiday. The State responds that trial counsel's decision to refrain from hiring a ballistics expert was an informed tactical decision and that the Petitioner cannot establish that he was prejudiced by this tactical decision. The State asserts that testimony from Bobby Holland would not have been beneficial for the Petitioner's case. The State asserts that the Petitioner cannot establish that the jury was not admonished on the first day of trial and that even if the trial court failed to instruct the jury on the first day, the Petitioner has not established that he was prejudiced by the trial court's failure to give the instruction. The State asserts that the Petitioner has failed to prove that the jury was pressured to reach a verdict because of the July 4th holiday.

The burden in a post-conviction proceeding is on the petitioner to prove the factual allegations to support his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); See Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). If the petitioner proves his allegations by clear and convincing evidence, the trial court must then determine whether trial counsel was ineffective according to Strickland v. Washington, 466 U.S. 668, 687 (1984). Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

Under the Sixth Amendment to the United States Constitution, when a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland,

466 U.S. at 687; see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). Failure to satisfy either prong results in the denial of relief. Strickland, 466 U.S. at 697. In other words, a showing that counsel's performance falls below a reasonable standard is not enough; rather, the petitioner must also show that "there is a reasonable probability" that but for the substandard performance, "the result of the proceeding would have been different." Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

In determining whether trial counsel's performance was deficient, this court has held that a "petitioner is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision made during the course of the proceedings." Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). "[D]eference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). An attorney's performance must be measured against the general standard of whether the services rendered were "within the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).

Relative to the decision to hire a ballistics expert, trial counsel testified that hiring an expert was not necessary given their theory of defense. Our review of the Petitioner's case reveals that trial counsel pursued an alibi defense. We agree that distancing the Petitioner from any 9mm weapons was an important issue at trial. Testimony from a ballistics expert contending that analysts could not prove that the same weapon was fired at the three locations or that the same weapon was not fired at the three locations would have weakened the State's theory of the case, thereby strengthening the Petitioner's defense. However, this court has long held that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). We cannot speculate as to what a ballistics expert might have said at trial. Id. Accordingly, we conclude that the Petitioner has failed to establish that trial counsel was deficient for failing to hire a ballistics expert.

Relative to trial counsel's failure to call Lord Meyers, Senora Joyner, or Henry Sapp as witnesses at trial, the record reflects that these witnesses would not have contributed to the Petitioner's defense. If trial counsel had called Mr. Meyers to testify concerning the

Petitioner's nonviolent nature, then the State would have been allowed to inform the jury about the Petitioner's involvement in the alleged shooting of Mike Stafford. Testimony from Ms. Joyner or Mr. Sapp would not have helped or hurt the Petitioner's case. Ms. Joyner testified at the post-conviction hearing that she did not see the Petitioner when the victim's body was found. Her testimony would not have foreclosed the possibility that the Petitioner could have been at the house earlier when Ms. Joyner was not there. Mr. Sapp's testimony at the post-conviction hearing belied the Petitioner's assertion that Mr. Sapp said that he heard that Bob Swafford would testify that the Petitioner did not kill the victim. Moreover, Bob Swafford testified at trial and did not mention anything about his belief of the Petitioner's guilt or innocence. Accordingly, we conclude that trial counsel was not deficient for failing to call these witnesses.

Relative to trial counsel's failure to call Bobby Holland as a witness at trial, counsel testified that the Petitioner never gave him Mr. Holland's name as a potential witness. Moreover, the proposed testimony would not have been beneficial for the Petitioner. The Smiths did not testify that Mr. Holland was present at their house the day the Petitioner shot a weapon on their property. Mr. Holland admitted that the Petitioner could have visited the Smith residence on another occasion. Additionally, the Petitioner could have shot the weapon while Mr. Holland was elsewhere on the property. Even if trial counsel might have impeached Bob and Helen Smith through Mr. Holland's testimony, Norman Blaylock and Roger Hodge also connected the Petitioner to a 9mm weapon. Norman Blaylock testified that he sold the Petitioner a 9mm rifle. Roger Hodge testified that the Petitioner purchased 9mm ammunition from him on the day of the victim's death. Accordingly, we conclude that the Petitioner has failed to establish that counsel was deficient for failing to call Mr. Holland as a witness at trial.

Relative to trial counsel's failure to remind the trial court to admonish the jury on the first day of trial, the record reflects that the trial court issued some instructions to the jury on the first day of trial. It is unclear whether these instructions were the typical jury admonishments or whether the trial court was merely addressing the jury. The Petitioner was told that he could obtain the entirety of the transcript to determine whether the trial court issued the admonishments, but the Petitioner has not submitted such a transcript for our review. However, the transcript before us reflects that the trial court admonished the jury toward the end of the trial at counsel's request. This admonishment was requested because the trial was almost over. Moreover, the Petitioner has not established that he was prejudiced by the court's alleged failure to admonish the jury on the first day of trial. The Petitioner has not even alleged that the jurors gathered outside information because the trial court failed to admonish them. Accordingly, we conclude that the Petitioner has failed to establish that

counsel was deficient for failing to remind the trial court to admonish the jury or that he was prejudiced by this alleged deficiency.

Relative to trial counsel's alleged failure to object to the trial court's instruction regarding the July 4th holiday, trial counsel testified that he was not aware that Mel Matthews may have said anything about the holiday to the jury. When trial counsel became concerned about this issue, he raised it in his motion for new trial and obtained an affidavit from Mr. Matthews. The affidavit belied trial counsel's concern as to whether the jury was rushed to reach a decision because of the holiday. Accordingly, we conclude that the Petitioner has failed to prove that trial counsel was deficient in this regard.

## CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-15-